**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

NICHOLAS VANNESS,
as Personal Representative of the
ESTATE OF JONATHAN
LEWIS VANNESS,
Plaintiff,

Case No.: 26-cv-13501
Hon.:

**JURY TRIAL DEMANDED**

v.

VITALCORE PHYSICIANS GROUP, PLLC, a Michigan professional limited liability company,
VITALCORE HEALTH STRATEGIES, LLC, a Kansas limited liability company,
SARAH B. STADEL, M.D., SPARROW CARSON HOSPITAL, a Michigan nonprofit corporation,
RICKEY COLEMAN, D.O., ROSILYN JINDAL, P.A.,
KELLY ADAMS, N.P., NATALYA STOKELY-HAMDAN, N.P.
KARL SINCLAIR, P.A., AMANDA PETERSON, LPC,
JANE DOE MEDICAL PROVIDER #1,
VICTORIA JANOWIECKI, N.P., ALLISON MELINOWSKI, R.N.,
ASHLEY WILLIAMS, R.N, JILLIAN TACKEBURY, R.N.,
CONSTANTINA LAMPROPOULOS, M.D.

Defendants.

---

IAN CROSS (P83367)
Attorney for Plaintiff
**CROSS LAW, PLLC**
402 W Liberty St
Ann Arbor, MI 48103
P: (734) 994-9590 / F: (888) 320-9382
ian@lawinannarbor.com

JONATHAN R. MARKO (P72450)
Attorney for Plaintiff
**MARKO LAW, PLLC**
220 W. Congress, Fourth Floor
Detroit, MI 48226
P: (313) 777-7529 / F: (313) 771-5785
jon@markolaw.com

## COMPLAINT

Plaintiff **NICHOLAS VANNESS**, as **Personal Representative of the Estate of JONATHAN LEWIS VANNESS**, by and through his attorneys, CROSS LAW, PLLC and MARKO LAW, PLLC, brings this action against Defendants for deprivation of Plaintiff's decedent's federally protected civil rights pursuant to 42 U.S.C § 1983, and for medical malpractice under Michigan law. For his cause of action against Defendants, Plaintiff respectfully states as follows:

## JURISDICTION AND VENUE

1. This action is brought against the Defendants pursuant to 42 U.S.C § 1983 for deprivation of civil rights secured by the Eighth Amendment to the United States Constitution, and for wrongful death and medical malpractice under Michigan common law and Michigan statutes

governing wrongful death and medical malpractice actions, including MCL § 600.2922 and MCL § 600.5838a.

2. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

3. On information and belief, not all Defendants are "residents" of Michigan as that term is defined in 28 U.S.C § 1391(c). On information and belief, Defendant Coleman resides in Colorado and Defendant Lampropoulos resides in California.

4. A substantial part of the events and omissions giving rise to these claims occurred in the Gus Harrison Correctional Facility in Lenawee County, in the Eastern District of Michigan, and in the Woodland Center Correctional Facility in Livingston County, also in the Eastern District of Michigan.

5. Venue in this District is proper per 28 U.S.C. § 1391(b)(2).

## THE PARTIES

6. Plaintiff Nicholas Vanness ("Plaintiff") is the duly appointed Personal Representative of the Estate of Jonathan Lewis Vanness, deceased. The Plaintiff is the brother of Decedent Jonathan Lewis Vanness.

7. Decedent Jonathan Lewis Vanness ("Vanness") was, at all times relevant to this complaint, an inmate in the custody of the Michigan Department of Corrections. Decedent Vanness was 27 years of age at the time of his death on September 24, 2025.

8. Defendant Vitalcore Health Strategies, LLC. f/k/a Viola Riggin LLC, is a Kansas limited liability company engaged in the provision of physical and mental healthcare services in correctional facilities. On information and belief, Viola Riggin is the CEO and majority owner of this entity.

9. On or about February 9, 2024, Viola Riggin signed a Novation Agreement with the Michigan Department of Corrections and the MDOC's former healthcare contractor, Grand Prairie Healthcare Services, P.C., to take over performance of the MDOC's $589,988,100.00 healthcare contract with Grand Prairie on May 1, 2024. Viola Riggin purportedly signed the Novation Agreement on behalf of: "VitalCore Physicians Group, PLLC ("**VitalCore**") a Kansas professional limited liability company."

10. No professional limited liability company named "VitalCore Physicians Group, PLLC" has ever been registered with the Kansas Secretary of State.

11. On information and belief, at the time Viola Riggin signed the Novation Agreement with the Michigan Department of Corrections, no entity named "VitalCore Physicians Group, PLLC" had ever existed in any jurisdiction.

12. Two companies with similar names had been organized in Kansas at the time Viola Riggin signed the Novation Agreement: "Vitalcore Associates, LLC," which had changed its name from "Vitalcore Investors, LLC" in 2022, and "Vitalcore Health Strategies LLC," which had changed its name from "Viola Riggin, LLC" in 2018.

13. Two companies with similar names had also been organized in Michigan at the time Viola Riggin signed the Novation Agreement: "Vitalcore Health PLC," a professional limited liability company organized on December 13, 2023, and "Vitalcore Physicians Group of Michigan PLLC," another professional limited liability company organized a few weeks later on January 8, 2024.

14. On June 24, 2026, more than two years after "VitalCore" began performing the MDOC's healthcare contract, "Vitalcore Physicians Group of Michigan PLLC" changed its name to "Vitalcore Physicians Group PLLC."

15. On information and belief, Viola Riggin intended to use either a Kansas or a Michigan professional limited liability company that would be nominally

owned by one of the employees of Defendant Vitalcore Health Strategies LLC as the contracting party for the $589,988,100.00 healthcare contract with the Michigan Department of Corrections.

16. This structure was attempted for two reasons. First, Viola Riggin and Defendant Vitalcore Health Strategies LLC wanted to use a professional corporation (which would be nominally owned by a physician) as the contracting party for the purpose of circumventing Michigan's prohibition on the corporate practice of medicine. The State of Michigan prohibits for-profit entities that are directly or beneficially owned or controlled by non-physicians from employing physicians to provide medical services. *See* MCL § 450.1283; MCL § 450.1288; MCL § 450.4908; MCL § 450.4904. This prohibition only applies to for-profit entities, "since the principal evils attendant upon corporate practice of medicine spring from the conflict between the professional standards and obligations of the doctors and the profit motive of the corporation employer," Michigan Attorney General Opinion No. 6770 (Sept. 17, 1993) (**Ex. A**), and "these evils are only likely to arise . . . when the physician is being supervised by a profit-seeking employer." *Id.* (citations omitted).

17. An Org Chart (**Ex. B**) for "VitalCore Physicians Group, PLLC" was appended to the MDOC's contract for prisoner healthcare services with that contemporaneously non-existent entity. The org chart shows that the entire purported "PLLC" senior management team – Viola Riggin, Stuart Hudson, Lorelei Ammons, and Raman Singh – are also senior management at Defendant Vitalcore Health Strategies LLC.

18. The "PLLC" Org Chart also shows non-physicians in supervisory roles over physicians within a for-profit organization engaged in the practice of medicine. The CEO of the "PLLC," Viola Riggin, is not a physician.

19. The org chart also misleadingly labels individuals in supervisory roles who are not physicians as "doctors." On information and belief, the "Dr. Ammons" who is shown in the PLLC org chart as the Chief Operating Officer for Clinical Strategies is Lorelei Ammons, a Vitalcore executive who holds a doctoral degree in psychology, not a degree in medicine. On information and belief, "Dr. Heather Ungeheuer," who is shown in the org chart as the direct supervisor of Defendant Dr. Rickey Coleman, D.O., also is not a physician. She holds a Doctor of Nursing Practice degree, which is an academic degree in nursing.

20. A professional limited liability company managed by non-physicians cannot lawfully engage in the practice of medicine in Michigan. With exceptions not relevant here, "if a professional limited liability company renders a professional service that is included within the public health code, 1978 PA 368, MCL §§ 333.1101 to 333.25211, then all members and managers of the company must be licensed or legally authorized in this state to render the same professional service." MCL § 450.4904(2). The practice of medicine is a professional service that is included within the public health code.

21. Additionally, a professional limited liability company that employs physicians to practice medicine cannot also engage in any other business activities that do not constitute the practice of medicine. Under Michigan law, a professional limited liability company "shall not engage in any business other than the rendering of the professional services for which it was specifically organized." MCL § 450.4907(1).

22. On information and belief, the second reason that Viola Riggin and Defendant Vitalcore Health Strategies LLC attempted to use a captive PLLC as the contracting party was to disguise what would be effectively a parent-subsidiary corporate relationship as an independent-contractor relationship, and to thus afford Defendant Vitalcore Health Strategies LLC the same

future opportunities to defraud Michigan creditors that the MDOC's two previous healthcare vendors (Corizon and Wellpath) had enjoyed.

23. Correctional healthcare contractors that operate in state prison systems predictably generate tort liability in the course of their operations. They also incur routine trade debts to networks of local vendors, like ambulance companies, hospitals, and the local defense attorneys who represent them in tort lawsuits. But unlike other operators in the healthcare industry, correctional healthcare contractors' relationships with local vendors are likely to be temporary. Their state government clients re-bid the contracts for prison healthcare every few years, so the contractors periodically cease doing business statewide when they do not prevail in the competitive bid process for a subsequent multi-year contract with the state.

24. As a result, correctional healthcare contractors' operations in a given state typically last for a discrete term of years, and they receive all of the revenue associated with their operations in that state before they incur all of the costs. A tort lawsuit, for example, is often filed years after the wrongful act that caused the plaintiff's injury, and there is almost always an additional multi-year delay between when the lawsuit is filed and when the claim is settled or reduced to judgment. The majority of the professional-liability-

related costs arising from a correctional healthcare contractors' final few years of operations thus do not come due until after the contractor has left the state.

25. The delay between the provision of offsite medical services for prisoners and payment to vendors such as hospital systems is not as long as the delay for tort liability and associated defense costs. But correctional healthcare contractors can often cease making payments to a hospital system for six months or more before the hospital starts refusing to treat prisoners and/or sues the contractor. For example, Defendant Vitalcore Health Strategies, LLC was able to stop paying The University of Texas Medical Branch at Galveston for treating its prisoner-patients in early 2025, yet that hospital continued accepting Vitalcore patients through at least August of 2025, and did not file suit to collect the $1.7 million it was owed until February of 2026.[1]

26. On information and belief, by placing the MDOC contract in a PLLC that would nominally be an independent contractor with separate ownership, but which it in fact controlled, Defendant Vitalcore Health Strategies, LLC hoped to give itself the option to evade its responsibilities to Michigan tort

1 *See*, *generally, University of Texas Medical Branch at Galveston v. VitalCore Health Strategies, LLC*, 3:26-cv-00051, (S.D. Tex.)

claimants, hospital systems, defense attorneys, and its own former Michigan employees in the event that it loses the MDOC contract, by simply abandoning the PLLC or filing it into bankruptcy upon contract termination.

27. On information and belief, during its Michigan operations, Defendant Vitalcore Health Strategies, LLC entered into a "Management Services Agreement" with an actual or purported PLLC that Vitalcore Health Strategies, LLC controls, whereby substantially all of the money paid to the PLLC by the State of Michigan in excess of current operational costs accrues to Defendant Vitalcore Health Strategies, LLC as "management fees." These management fees render the contract profitable for Defendant Vitalcore Health Strategies, LLC. Meanwhile, the PLLC generates no profit, or a nominal profit, and always remains severely undercapitalized relative to the liabilities that it incurs. Upon termination of the MDOC contract with the PLLC, the PLLC will be rendered an insolvent, assetless shell, laden with tort liability, trade debt to Michigan subcontractors, and indemnification obligations to its former Michigan employees, while Vitalcore Health Strategies, LLC will retain all of the insider "management fees" that it charged the PLLC over the course of the Michigan contract.

28. On information and belief, Defendant Vitalcore Physicians Group, PLLC, f/k/a Vitalcore Physicians Group of Michigan, PLLC, is a mere instrumentality or alter-ego of Defendant Vitalcore Health Strategies, LLC, and Defendant Vitalcore Health Strategies, LLC's control over Defendant Vitalcore Physicians Group, PLLC is so complete that Defendant Vitalcore Physicians Group, PLLC has no separate mind, will, or existence of its own.

29. On information and belief, Defendant Vitalcore Health Strategies, LLC is using Defendant Vitalcore Physicians Group, PLLC to commit a fraud or wrong, specifically, to evade Michigan's ban on the corporate practice of medicine, and to afford itself the opportunity to defraud Michigan tort claimants, trade creditors, and its own medical-professional employees (who will be left with no defense and indemnification coverage for tort claims) in the event that it loses the MDOC healthcare contract to a competitor.

30. On information and belief, Defendant Rickey Coleman, D.O., ("Dr. Coleman") is a Doctor of Osteopathic Medicine who resides in Colorado and is not board-certified in any specialty. Dr. Coleman is employed by either Defendant Vitalcore Physicians Group, PLLC or Defendant Vitalcore Health Strategies, LLC (hereafter collectively, "Vitalcore") as the Utilization Management Director for the MDOC contract.

31. Dr. Coleman's job duties include screening recommendations issued by other medical professionals for specialist/offsite medical services for Michigan prisoners, and denying those requests where possible. Specialist/offsite medical services are medical services that are not provided at the prisons by Vitalcore employees, and which result in a third-party medical provider sending Vitalcore a bill for the service. Vitalcore and the MDOC are each responsible for a portion of the cost of specialty/offsite medical care for Michigan prisoners under the risk-share provisions of their contract.

32. The purpose of Dr. Coleman's job is to save money for Vitalcore by limiting the volume of specialty/offsite medical care that Michigan prisoners receive.

33. Defendant Amanda Peterson, LPC, ("LPC Peterson") is a Licensed Professional Counselor who was, at all times relevant to this Complaint, employed by the Michigan Department of Corrections to provide mental health counseling services to inmates at the Carson City Correctional Facility.

34. Defendants Rosilyn Jindal, P.A., Karl Sinclair, P.A., Kelly Adams, N.P., Natalya Stokely-Hamdan, N.P., Victoria Janowiecki, N.P. and Jane Doe Medical Provider #1 are medical providers who at all relevant times were

employed by VitalCore to provide primary-care medical treatment to prisoners in MDOC facilities. Defendants Jindal and Janowiecki worked at Gus Harrison Correctional Facility, Defendants Sinclair and Stokely-Hamdan worked at Woodland Center Correctional Facility, and Defendants Adams and Jane Doe Medical Provider #1 worked at Carson City Correctional Facility.

35. Defendants Allison Melinowski, R.N., Jillian Tackebury, R.N., and Ashley Williams, R.N. are the Registered Nurses who, at all times relevant to this action, were employed by the Michigan Department of Corrections to provide medical care to prisoners in MDOC custody. Defendants Melinowski and Tackebury worked at the Carson City Correctional Facility, while Defendant Williams worked at the Gus Harrison Correctional Facility.

36. Defendant Sarah B. Stadel, M.D., ("Dr. Stadel") is an emergency medicine physician employed by Defendant Sparrow Carson Hospital, a Michigan nonprofit corporation.

37. On information and belief, Defendant Constantina Lampropoulos, M.D. is a radiologist who reviews imaging studies of MDOC prisoners remotely from California. She is not an employee of VitalCore or the MDOC.

## COMMON ALLEGATIONS

### I. Vanness is severely mentally-ill and suicidal

38. In the summer of 2025, Vanness was a 27-year-old prisoner in the custody of the Michigan Department of Corrections with multiple psychiatric diagnoses, including bipolar disorder with psychotic features.

39. On May 13, 2025, Vanness was transferred into the Carson City Correctional Facility. Defendant Peterson performed an intake mental health exam on Vanness on May 20, 2025. During the intake exam, Defendant Peterson noted that Vanness "claimed adamantly that they were the Messiah" and "state[d] that they have another personality named Onica, who they believe is an elemental witch from another world that inhabited their body."

40. On May 31, 2025, custody staff reported to Nicole Holbrook, LMSW, an on-duty mental health provider at Carson City Correctional Facility, that Vanness had expressed a desire to engage in self-harm. Ms. Holbrook placed Vanness on a High Risk suicide prevention plan.

41. Per the plan, Vanness was placed in an observation cell with direct, face-to-face continuous observation, was dressed only in a tear-resistant gown, and was not given access to any personal property. Vanness was only permitted finger foods and was not allowed access to any utensils.

42. Defendant Peterson performed follow-up mental health exams of Vanness on June 2, 2025 and June 3, 2025. During both the June 2 exam and the June 3 exam, Defendant Peterson charted that Vanness was experiencing suicidal ideation, and was expressing an intention to “"bash" their head against the wall or wrap a sheet around their neck” in order to commit suicide. During the June 3 exam, Defendant Peterson noted that Vanness reported auditory hallucinations, specifically, that “they are hearing voices telling them to kill themselves.”

43. Immediately following the June 3, 2025 mental health exam, Vanness was escorted by custody staff to a shower. Defendant Peterson then personally observed Vanness banging his head against the glass door of the shower.

44. On June 4, 2025, custody staff reported to Defendant Peterson that Vanness had not slept in the past 24 hours.

45. On June 5, 2025, Defendant Peterson ordered the removal of all of Vanness’ suicide-prevention restrictions, including restoring his access to eating utensils and personal property.

46. On the morning of June 6, 2025, as a result of Defendant Peterson’s decision to remove all suicide-prevention restrictions, Vanness received a spork with

his meal tray. At around 10:00 am that morning, Vanness swallowed the spork.

**II. Defendants confirm that Vanness has swallowed a spork, but take no action to have it removed for over three months until Vanness dies of a bowel perforation**

47. On the morning of June 6, 2025, Vanness told a custody officer that he had swallowed a spork. Vanness said that he had swallowed the spork “whole” and had not broken it into pieces. The custody officer informed an on-duty nurse, who ordered Vanness transported to the Sparrow Carson Hospital ER.

48. Vanness was treated at Sparrow Carson Hospital by Defendant Dr. Sarah B. Stadel, M.D., a physician who is board-certified in Emergency Medicine. Defendant Stadel ordered an x-ray of Vanness’ abdomen, which revealed a “faint radiopaque foreign body corresponding to reported history of swallowed Spork” in Vanness’ stomach. The radiologist “recommend[ed] GI consultation.”

49. The standard of care for treatment of a swallowed foreign object depends on the size and shape of the object. Objects with pointed ends, such as utensils, or objects measuring more than 6 cm in length should be promptly removed from the stomach via an upper endoscopy, or esophagogastroduodenoscopy

(EGD). In this procedure, a gastroenterologist inserts a scope with a camera on its end down the patient's throat, into the stomach, and if necessary, into the first section of the small intestine. There is a channel inside the scope that the gastroenterologist can insert thin grabbing or cutting tools into, in order to reach objects inside the stomach or the first part of the small intestine. The gastroenterologist locates the foreign object, grabs it, and pulls it back up out of the patient's mouth. The procedure typically takes less than an hour, and the patient can leave the hospital the same day.

50. The reason that objects longer than 6 cm should be removed from the stomach, rather than allowed to continue progressing into the intestines, is because of the risk of intestinal blockage or perforation. A long, rigid object like a spork can get stuck in the tight loops of the small intestine, creating life-threatening internal injuries. The reason that sharp or pointy objects should be removed from the stomach, rather than allowed to continue progressing into the intestines, is because sharp or pointy objects are much more likely than smooth, blunt objects to puncture the intestinal wall.

51. It is also important to remove long, rigid, and pointy objects like a spork promptly, because an EGD procedure can only reach foreign objects in the esophagus, stomach, or approximately the first foot of the small intestine.

Once an object has passed deeper into the small intestine, it can only be removed via an invasive surgery, which involves cutting into the abdominal cavity and the small intestine.

52. On information and belief, on June 6, 2025, Sparrow Carson Hospital was a small, rural hospital that did not have the necessary personnel and equipment to perform an EGD procedure on-site. In order to remove the spork from his stomach, Vanness would need to be transferred to a larger hospital with the capability to perform an EGD procedure.

53. At approximately 1:13pm on June 6, 2025, Defendant Stadel received the radiologist's report for the x-ray she had ordered of Vanness' abdomen. She knew, after seeing the report and the x-ray film, that the spork was approximately 11cm long and located in the stomach.

54. On information and belief, if she had been left to her own devices, Dr. Stadel would have ordered Vanness transferred to a larger hospital to be seen by a gastroenterologist that day. However, rather than allowing Dr. Stadel to make the referral, Defendant Dr. Rickey Coleman intervened.

55. On information and belief, Dr. Rickey Coleman, D.O. is a physician who resides in Colorado and is employed by Defendant Vitalcore. Defendant

Coleman is not board-certified in Emergency Medicine, Gastroenterology, or in any other specialty.

56. On information and belief, Defendant Coleman has never examined, spoken to, or treated Vanness.

57. Defendant Coleman is Vitalcore's "Utilization Management" Director for the MDOC contract. His job is to interfere with the plans of treatment that are prescribed or recommended by the medical professionals who actually examine and treat MDOC prisoners, in order to limit the volume of "off-site" medical care that prisoners receive, which Vitalcore is partially or wholly responsible for paying for.

58. On information and belief, Vitalcore implemented a policy whereby Defendant Coleman was notified whenever an MDOC prisoner was transported to the ER for a potentially-costly medical procedure. Defendant Coleman was then required to contact the medical professionals at the ER and intervene in the plan of treatment in order to minimize Vitalcore's financial exposure. Under the procedures set up by Vitalcore, all hospital admissions and transfers to other hospitals for MDOC prisoners required Dr. Coleman's approval.

59. Under its contract with the MDOC, Vitalcore is paid a fixed fee per-prisoner, per-month ("PPPM") to provide any necessary healthcare services to MDOC prisoners. In addition to the fixed fee, the MDOC pays 50% of Vitalcore's costs for "specialty services," when the population-wide total cost of specialty services is above the "risk share base PPPM" but below the "risk share maximum cap PPPM" in a given quarter. Vitalcore is financially responsible for 100% of the cost of specialty services that exceed the risk share maximum cap in a given quarter. "Specialty services," for purposes of the contract, are services that medical professionals who are not employed by the MDOC or Vitalcore provide to MDOC prisoners.

60. Thus, during a fiscal quarter when the aggregate cost of specialty services for the MDOC prisoner population is above the risk-share base PPPM and below the risk-share maximum cap PPPM, every dollar that Vitalcore can avoid spending on specialty care increases its profit by 50 cents. During a fiscal quarter when the aggregate cost of specialty services for the MDOC prison population is above the risk share maximum cap PPPM, every dollar that Vitalcore can avoid spending on specialty care increases its profit by one dollar.

61. While it accepts hundreds of millions of dollars of public money to care for Michigan prisoners, Vitalcore also manages to foist a large portion of its costs for specialty care back onto taxpayers through the Michigan Medicaid program.

62. Since Michigan opted-in to the Affordable Care Act's Medicaid expansion in April of 2014, Michigan's Medicaid program has provided free or low-cost healthcare coverage to childless adults with incomes below 138% of the federal poverty line. Prisoners are normally ineligible for Medicaid; federal regulations prohibit the use of Medicaid funds to provide services to "[i]ndividuals who are inmates of public institutions as defined in § 435.1010[,]" a definition which includes inmates in state prisons. *See* 42 C.F.R. § 435.1009(a)(1); 42 C.F.R. § 435.1010.

63. However, when a state prisoner is transported out of the prison and admitted to a community hospital for a stay of longer than 24 hours, the prisoner technically does not meet the federal regulations' definition of an "inmate[] of [a] public institution[]" during the time period when the prisoner is residing in the community hospital rather than in the prison. Vitalcore takes advantage of this loophole by automatically enrolling Michigan prisoners in

Medicaid whenever they are admitted to a hospital for a stay longer than 24 hours.

64. By enrolling Michigan prisoners in Medicaid whenever they are hospitalized for more than 24 hours, Vitalcore is able to saddle taxpayers with nearly 100% of its costs for these longer-term inpatient hospitalizations.

65. On information and belief, Defendant Coleman knew that an EGD procedure to remove a spork from Vanness' stomach was unlikely to require an inpatient admission lasting longer than 24 hours, so Vitalcore would not be able to dump the cost of the procedure onto Medicaid.

66. On information and belief, Defendant Coleman also knew that if the spork left the stomach and moved deeper than about a foot into Vanness' small intestine, an EGD procedure would not be able to reach it. In order to remove the spork from deep in the small intestine, a surgeon would need to cut into Vanness' abdominal cavity and either cut out a section of his small intestine containing the spork and connect the two ends, or cut a slit in the small intestine, remove the spork, and suture the slit closed.

67. Either of these surgical procedures is substantially more invasive and higher-risk than an EGD procedure. Either procedure would also require a multi-

day hospital stay, which Vitalcore could avoid paying for by enrolling Vanness in Medicaid while he was in the hospital.

68. However, even if Vanness received abdominal surgery requiring a multi-day hospital stay, Vitalcore would still incur offsite costs. Surgical planning activities, like an initial consult with a surgeon or a CT scan, would occur on an outpatient basis prior to the surgery, and Vitalcore would have to pay for them. Even if the surgery occurred on an emergency basis following an ER admission, Vitalcore would still be hit with a bill for the ambulance ride to the hospital.

69. The only way that Vitalcore could avoid all costs associated with removing the spork from Vanness' GI tract was if Vanness passed the spork himself.

70. On information and belief, in an effort to reduce Vitalcore's costs and thus increase its corporate profit, Defendant Coleman contacted Defendant Stadel while Vanness was in the ER for the purpose of interfering with Defendant Stadel's treatment plan. Defendant Coleman caused Defendant Stadel to discharge Vanness back to the prison without a GI consult, rather than transferring him to a larger hospital for an EGD procedure when the spork was still in the stomach.

71. On information and belief, Defendant Coleman knew that allowing the spork to migrate deeper into Vanness' small intestine exposed him to a substantial risk of serious harm, including bowel perforation and death.

72. On information and belief, Defendant Coleman knowingly exposed Vanness to substantial risks of serious harm, including bowel perforation and death, in order to attempt to save money for Vitalcore by making Vanness pass the spork.

73. Defendant Stadel released Vanness back to the prison without a GI consult, even though the standard of care required her to refer him to a gastroenterologist for removal of the spork. However, in her assessment and plan on discharge, Defendant Stadel wrote:

> "At present, he is not experiencing any distress or vomiting. Should he exhibit any worsening symptoms such as increased abdominal pain or vomiting, he will be required to return to the emergency room for a probable transfer to another facility for an esophagogastroduodenoscopy (EGD)."

74. In the one hundred and ten days between the discharge from the hospital on June 6, 2025 and Vanness' death from bowel perforation on September 24, 2025, Vanness did, in fact, exhibit worsening symptoms, including severe abdominal pain and vomiting on numerous occasions. But despite Dr.

Stadel's express discharge instructions, Vanness was never returned to a hospital.

75. On June 9, 2025, Vanness reported sharp, stabbing abdominal pain to Gage Schall, RN, a nurse at the correctional facility. Ms. Schall reported Vanness' symptoms to the "onsite provider," Defendant Jane Doe Medical Provider #1. Although Defendant Jane Doe Medical Provider #1 spoke with Vanness on June 9, 2025, she did not document the visit in Vanness' electronic medical records, so her identity remains unknown to Plaintiff. Defendant Jane Doe Medical Provider #1 did not return Vanness to the ER per Dr. Stadel's treatment plan, even though Vanness' chart confirmed that there was a spork in the patient's gastrointestinal tract.

76. On information and belief, Defendant Jane Doe Medical Provider #1 failed to immediately refer Vanness to the ER because of a Vitalcore custom or policy of encouraging medical providers to treat patients on-site at the prison whenever possible, and to send prisoners to the ER only sparingly.

77. Vitalcore implemented this policy, in part, through daily Utilization-Management phone calls with every Vitalcore-contracted facility. In these daily calls, a member of Vitalcore's corporate nursing staff interrogates the medical providers at each facility about any patient who is hospitalized or

has been sent offsite for any reason in the previous 24 hours. By making its medical providers justify every offsite referral to a corporate supervisor, Vitalcore discouraged its front-line medical providers from sending patients offsite.

78. On the morning of June 10, 2025, Defendant Kelly Adams, N.P. reviewed Vanness' medical records from his June 6, 2025 visit to the ER. That day, Defendant Adams wrote in Vanness' chart, "Patient in seg after returning from the ER fro [sic] swallowing a spork. Will continue to evaluate patient. If worsening symptoms, will send back to ER."

79. On the morning of June 11, 2025, Vanness reported to R.N. Leiah Beach that the abdominal pain had worsened to 7/10. Vanness' pain was charted at 5/10 two days earlier. Ms. Beach reported the worsening abdominal pain to Defendant Adams, but rather than sending Vanness back to the ER, Adams prescribed only Tylenol. Later that day, Vanness was transferred from Carson City Correctional Facility to Woodland Center Correctional Facility.

80. On information and belief, Defendant Adams failed to immediately refer Vanness to the ER, despite her knowledge that Vanness had a spork in his GI tract, and her knowledge that the ER doctor had ordered that Vanness be returned to the ER for an EGD if his symptoms worsened, because of a

Vitalcore custom or policy of encouraging medical providers to treat patients on-site at the prison whenever possible, and to send prisoners to the ER only sparingly.

81. On information and belief, Defendant Adams knew that a long, rigid object with pointy ends like a spork should be endoscopically removed from a patient’s stomach immediately, before it passes deeper into the small intestine and can no longer be reached with an endoscope. Defendant Adams also knew that allowing a long, rigid object with pointy ends like a spork to move deeper into the small intestine exposes the patient to a substantial risk of serious harm, including risks of intestinal blockage, intestinal perforation, and death.

82. At Woodland Center Correctional Facility, Vanness underwent an abdominal x-ray on June 12, 2025 to see if the spork had passed. The x-ray was read by Defendant Dr. Constantina Lampropoulos, M.D., a contracted outside radiologist residing in California.

83. Defendant Lampropoulos failed to identify the spork on the x-ray. She failed to compare the x-ray to the previous study taken six days earlier when Vanness was at the ER in Carson City. She also may have copy-and-pasted the “conclusions” section into her report from a study involving a

completely different patient, since her "conclusions" refer to a "right ankle," a part of the body which would not have been imaged by a KUB (kidney, ureter, and bladder) abdominal x-ray.

84. The "conclusions" section of Defendant Lampropoulos' radiology report also discusses the lack of a "bone abnormality to suggest a recent fracture or dislocation," which was never suspected, states that "[t]here is soft tissue swelling" without explaining what tissues in the abdomen were swollen, and incorrectly indicates that, "there is no prior study available for comparison."

85. Defendant Lampropoulos breached the standard of care for a radiologist of ordinary training and experience when she did not compare the 6/12/25 x-ray to the previous x-ray taken on 6/6/25, did not identify the location of the spork, and included what are apparently findings for a different body part on an entirely different patient in the "conclusions" section of her radiology report for Vanness' 6/12/25 KUB x-ray.

86. At approximately 2:50 am on June 14, 2025, nursing staff were called to Vanness' cell at Woodland Center Correctional Facility, due to Vanness' complaints of extreme abdominal pain. Vanness reported nausea and abdominal pain that was a 10 on a scale of 1 to 10. A physical exam revealed hypoactive bowel sounds in all four quadrants, tachycardia (heart beating at

105 beats per minute), and a temperature of 99.1, which is elevated relative to this patient's baseline body temperature. Vanness also reported that the spork had not passed.

87. "Hypoactive bowel sounds" mean that when a medical professional listens to the abdomen with a stethoscope, they hear the intestines gurgling less than normal. This is a sign that the intestines are contracting less frequently, which can indicate a mechanical blockage in the intestinal tract. An elevated body temperature and heart rate can indicate that the body is responding to an inflammatory process, like an injury to the intestinal wall with bacterial contamination.

88. Defendant Sinclair reviewed the nurses' findings and examined Vanness himself about three and a half hours later, at 6:14 AM. Vanness told Defendant Sinclair, "I know I need surgery. My stomach hurts."

89. Despite his knowledge that Vanness had swallowed a spork on June 6, and his knowledge that Vanness' plan of treatment called for him to be returned to the ER immediately if he experienced worsening symptoms such as increased pain or vomiting, Defendant Sinclair did not order Vanness transported to the ER on the morning of June 14.

90. On information and belief, Defendant Sinclair failed to immediately refer Vanness to the ER because of a Vitalcore custom or policy of encouraging medical providers to treat patients on-site at the prison whenever possible, and to send prisoners to the ER only sparingly.

91. Defendant Sinclair knew that leaving the spork in Vanness' gastrointestinal tract exposed Vanness to a substantial risk of serious harm, including risks of intestinal perforation and death.

92. In his notes from the encounter, Defendant Sinclair wrote, "On repeat abdominal X-ray, X-ray from 6/12/2024 [sic] shows no bowel obstruction." However, Defendant Lampropoulos' radiology report from 6/12/2025[2] is obviously erroneous, because it refers to a "right ankle," which would not even be visible on a KUB abdominal x-ray, discusses "soft tissue swelling," and states that "there is no prior study available for comparison[,]" when prior x-rays showing the spork in the stomach were taken on June 6th.

93. Defendant Sinclair ordered a repeat abdominal x-ray with a June 16, 2025 due date. However, the x-ray that Defendant Sinclair ordered was not taken by the 16th. Defendant Sinclair did not follow up to ensure that it was done.

2 Defendant Sinclair also cited the wrong year when referencing the date of the x-ray.

94. On June 13, 2025, a Friday, a routine blood draw was taken from Vanness by the psychiatric treatment team at Woodland Center Correctional Facility, for the purpose of monitoring Vanness' compliance with psychiatric medication. Psychiatrist Zachary Gleeson, D.O. reviewed the blood test results and met with Vanness on Monday, June 16th. Although Dr. Gleeson practices psychiatry, not physical medicine, he noticed that Vanness' blood panel showed an abnormally-high white blood cell count. Dr. Gleeson charted that, "Patient denies [psychiatric] medication side effects but admits to nausea, vomiting and decreased appetite since swallowing a spork at sending facility. Labs just returned suggestive of a possible infection and will be referred to medical for a chart review."

95. Defendant Sinclair received Dr. Gleeson's referral on the morning of June 17th, notifying him that Vanness had an abnormally-high white blood cell count on his June 13 blood draw. Vanness' white blood cell count was 23,090 per microliter of blood, consisting of 84% neutrophils, and an absolute neutrophil count of 19,380 per microliter. This is an abnormally high white blood cell count, an abnormally high neutrophil percentage, and an abnormally high absolute neutrophil count. A high white blood cell count,

combined with a high percentage of neutrophils, is evidence that the body is responding to an acute bacterial infection or significant physical trauma.

96. The elevated heart rate, elevated body temperature, extreme abdominal pain, and hypoactive bowel sounds recorded at 2:50 AM on June 14, combined with the elevated white blood cell count, elevated neutrophil percentage, and elevated absolute neutrophil count from the June 13th blood draw, together suggest that around June 13 through the early morning hours of June 14, the spork was puncturing the wall of Vanness' intestine.

97. Rather than sending Vanness to the hospital, Defendant Sinclair dismissed the high white blood cell count, elevated neutrophil percentage, and elevated absolute neutrophil count from the June 13th blood draw as a "lab error." Defendant Sinclair also did not send Vanness to the hospital after learning that Vanness was vomiting on 6/17.

98. Defendant Natalya Stokely-Hamdan, N.P. reviewed Vanness' chart on June 16th. She had initially examined him at intake when he arrived at Woodland Center Correctional Facility on June 11, noted the spork, and prescribed laxatives rather than referring Vanness to a gastroenterologist.

99. After she reviewed his chart on June 16, Defendant Stokely-Hamdan knew that Vanness had reported extreme abdominal pain and nausea in the early

morning hours of June 14th, that his heart rate and body temperature were elevated, that his bowel sounds were hypoactive, and that a blood draw from the afternoon of June 13th showed an elevated white blood cell count, high neutrophil percentage, and elevated absolute neutrophils.

100. Defendant Stokely-Hamdan also knew that his discharge instructions from the ER on June 6 called for him to be returned to the ER for removal of the spork if he experienced worsening symptoms, including abdominal pain or vomiting.

101. Defendant Stokely-Hamdan was aware that the cause of Vanness' abdominal symptoms was not a mystery: he had a spork in his gastrointestinal tract. Defendant Stokely-Hamdan should have sent Vanness to the ER, or referred him for a CT scan to locate the spork, with a subsequent referral to either a gastroenterologist or a general surgeon to remove it.

102. Instead of referring Vanness for outside testing and treatment to locate and remove the spork from his GI tract, Defendant Stokely-Hamdan decided on June 16 to treat Vanness with Tylenol.

103. Prescribing Tylenol to treat a patient with a long, pointy foreign object that had been stuck in the gastrointestinal tract for ten days was so woefully

inadequate as to amount to no treatment at all. In fact, prescribing Tylenol is worse than doing nothing, because it blunts the one signal (increased pain) that had any realistic chance of timely alerting medical staff if Vanness' condition deteriorated.

104. When Defendant Stokely-Hamdan decided to try to let Vanness try to pass the spork, rather than making a referral for a CT scan and surgery to remove the spork, she exposed the patient to a substantial risk of serious harm. Such harm included the risk of intestinal perforation and death.

105. On information and belief, Defendant Stokely-Hamdan decided to try to let Vanness try to pass the spork, rather than making a referral for a CT scan and surgery to remove it, due to a Vitalcore custom or policy of encouraging medical providers to treat patients on-site at the prison whenever possible, and to send prisoners for offsite treatment only sparingly.

106. Before Vanness was transferred to Woodland Center Correctional Facility, a provider at Carson City Correctional Facility had ordered a series of four abdominal x-rays to be taken on 6/11, 6/17, 6/24, and 7/1. The first three x-rays were actually taken on 6/12, 6/20, and 6/26, after Vanness had been transferred to Woodland.

107. On 6/27, the ordering provider at Carson City Correctional Facility reviewed the radiology report for the 6/26 x-ray. The 6/26 report noted that "[t]here is a faintly radiopaque object over the lower abdomen, just to the left mild of midline at L4/5 level, stable on review of prior exam, which may represent a plastic utensil." This means that the spork was at the level of the L4-L5 vertebrae, which is below the stomach and in the middle of the small intestine. It had not moved since the 6/20 x-ray.

108. On Friday, June 27th, 2025, the ordering provider at Carson City wrote a review note in Vanness' chart addressed to the physician at Woodland, quoting the 6/26 x-ray report and directing the Woodland physician, Dr. Vindhya Jayawardena, to review it and determine a plan of care. Dr. Jayawardena saw the note on Monday, June 30, and delegated this task to the "POD MP," a midlevel medical provider covering the "pod" where Vanness was housed. But by the time Dr. Jayawardena delegated the task, Vanness was already in transit to a third prison: Gus Harrison Correctional Facility.

109. At Gus Harrison, responsibility for reviewing the 6/26 x-ray and determining a plan of care fell on Defendant Victoria Janowiecki, N.P. On July 1, 2025, Defendant Janowiecki reviewed the radiology reports from the June 20 and June 26, 2025 x-rays, noted that the spork had remained in the

same location in Vanness' lower abdomen for at least a week, and took no action that day, other than canceling and re-issuing the order for the fourth abdominal x-ray.

110. The fourth abdominal x-ray, with a 7/2 due date, was never performed. Defendant Janowiecki did not follow up to make sure the x-ray was taken. She did nothing to determine the location of the spork or arrange for its removal, and she never examined Vanness herself.

111. From July 2nd through the first half of August, no Vitalcore medical provider followed up about the spork in Vanness' intestine, despite Vanness' repeated requests for medical attention. On July 21, 2025, Vanness submitted a healthcare request form stating, "I am having trouble pooping and having stomach pain." Vanness submitted another healthcare request form on July 30, 2025, which reads:

> "I have stomach pains all the time due to me swallowing a plastic sport about a month ago at Carson City correctional and it was never removed at all it was never passed either it hurts to eat and use the restroom on a 0 to 10, ten being the high its A 7 in pain please help me remove this object."

112. On August 9, 2025, Vanness submitted another healthcare request form, which reads:

> "I have seen the nurse about my stomach and did nothing but get my vitals checked I have a spork in my stomach and it's hurting very

> badly I can feel the object in me please remove or help me remove it ASAP"

113. Despite Vanness' repeated pleas for help, Defendant Janowiecki took no action to help Vanness, other than prescribing Tylenol on August 12, 2025, without even seeing the patient.

114. Defendant Janowiecki had actual knowledge that Vanness had a spork lodged in his intestinal tract, which had been there since early June. Defendant Janowiecki also knew that failing to remove a plastic utensil that is lodged in a patient's small intestine poses a substantial risk of serious harm to the patient, including risks of bowel perforation and death.

115. On information and belief, Defendant Janowiecki decided to do nothing, and try to let Vanness try to pass the spork rather than making a referral for a CT scan and surgery to remove it, due to a Vitalcore custom or policy of encouraging medical providers to treat patients on-site at the prison whenever possible, and to send prisoners for offsite treatment only sparingly.

116. The healthcare request forms that Vanness submitted in July and August 2025 were initially screened by nurses. On Sunday, July 27, 2025, Defendant Ashley Williams, R.N. saw Vanness at sick call at Gus Harrison for abdominal discomfort and constipation that had lasted for several days.

Defendant Williams performed a rectal examination and charted “Black Stool on Glove” and “Tenderness.”

117. Black stool is a recognized sign of bleeding in the gastrointestinal tract. In a patient known to have a long, pointed foreign object lodged in his intestine, black stool suggests that the object has cut into the intestinal wall, releasing blood into the intestine. Defendant Williams did not test the stool for blood, did not notify a medical provider, and did not mention the spork anywhere in her note. She assessed Vanness as constipated, gave him a laxative, and sent him back to his housing unit.

118. Defendant Williams saw Vanness again at sick call on the evening of Friday, August 1, 2025. This time Vanness told her that his abdominal discomfort was due to “swallowing [a] fork” months earlier, that he had been “sent to [the] hospital and was told he would pass the object,” and that he was “unsure [if the] object was passed.” Defendant Williams found his abdomen mildly tender. She notified the on-site medical provider by telephone, and the provider “instructed [her] to give Tylenol for discomfort.” Nothing in Defendant Williams’ note indicates that she told the provider about the black stool she had found five days earlier, and she did not refer Vanness to be examined by a provider.

119. Defendant Williams knew on July 27 and August 1, 2025 that Vanness had swallowed a spork that had never been removed or passed, and that he was in ongoing abdominal pain. She knew that a retained sharp foreign body in the intestine exposes a patient to a substantial risk of serious harm, including bowel perforation and death. Rather than notifying a medical provider that Vanness required an urgent surgical referral, she treated Vanness' symptoms with a laxative and Tylenol.

120. On the morning of August 12, 2025, Vanness returned to sick call and told the nurse, "I swallowed a spork about a month ago and after I did that, I started having abd pain. It's right here (pointing to mid abd above pubis) It's a 7." The nurse notified the on-site medical provider, and the response was a three-day "nursing order" for Tylenol. Defendant Janowiecki cosigned that note the same afternoon. By that date Vanness had been at Gus Harrison for six weeks with a spork lodged in his intestine, had submitted three written requests to have it removed, and had not been examined by a medical provider.

121. On August 13, 2025, Vanness returned to sick call again with sharp, intermittent 7/10 abdominal pain and no bowel movement for two days. The

nurse charted that "onsite MP (Jindal)" was notified, and scheduled Vanness to see Defendant Rosilyn Jindal, P.A. the following day.

122. Defendant Jindal examined Vanness on August 14, 2025. Vanness told Defendant Jindal that he had swallowed a spork on June 6, 2025, that he was "unsure if they have passed the spork since then," that he was having a bowel movement only once every three to four days, and that he had sharp, 8/10 pain in the left lower quadrant of his abdomen.

123. Defendant Jindal reviewed the June 6 ER x-ray report and quoted it in her note: the object was a "faint radiopaque foreign body corresponding to reported history of swallowed spork" that "approximates 11 cm in length." She also reviewed and quoted the June 26 x-ray report, which placed the object "over the lower abdomen, just to the left mild of midline at L4/5 level, stable on review of prior exam."

124. Defendant Jindal diagnosed Vanness with "Constipation, unspecified" and "Foreign body of alimentary tract." She prescribed Dulcolax, a laxative; "encouraged [Vanness] to increase fluid intake"; discontinued the abdominal x-ray that Defendant Janowiecki had ordered for July 2 and never obtained; and ordered a new abdominal x-ray at "Routine" priority with a due date of

August 20, 2025, six days later. She did not order a CT scan, did not refer Vanness to a gastroenterologist or a surgeon, and did not send him to the ER.

125. On the morning of August 20, 2025, the x-ray was taken. The radiologist reported a "faintly radiopaque obliquely oriented foreign body consistent with plastic utensil at the approximate L4-5 level, essentially unchanged position from comparison studies" of June 20 and June 26. The spork had not moved in two months.

126. That same afternoon, at approximately 1:30 p.m., Vanness was brought to the Gus Harrison clinic as an urgent/emergent encounter. The nurse who saw him charted the following: "ABD pain, epigastric, 10/10 sharp/intermittent. Nausea and vomiting. Emesis x5. Started early AM. Has not been able to consume food or drink this day. Prisoner states that they have a 'spork' in their body that they swallowed in June 2025. Prisoner gets serial imaging, FB has not moved in location since June. Prisoner also states that they are not passing gas and cannot remember when they had a BM last. BS are hypoactive. Prisoner appears uncomfortable, pale, clammy."

127. The nurse's examination found hypoactive bowel sounds, tenderness, and "Guarding" of the abdomen, and she charted that Vanness "Appears in Distress" and "Appears in Pain." "Guarding" is the involuntary tensing of

the abdominal muscles when the abdomen is touched. It is a sign of irritation of the lining of the abdominal cavity from injury or inflammation inside it. “Emesis x5” means that Vanness vomited five times. Repeated vomiting, the inability to pass gas, and hypoactive bowel sounds are, together, the signs of a bowel obstruction.

128. The nurse notified Defendant Jindal, who evaluated Vanness in the housing unit that afternoon. Defendant Jindal did not complete her note until the following morning, “due to clinic needs.” Her note records that Vanness had 10/10 “diffuse abdominal pain” “[a]ssociated with constipation, N/V,” and that the repeat x-ray showed the spork in an “essentially unchanged position from comparison studies.” In the same note, and in direct contradiction to the nurse who had examined Vanness minutes before her, Defendant Jindal charted that Vanness “Appears Well,” was “Well Developed/Well Nourished,” and was neither “Acutely Ill” nor “Appear[ing] in Pain.”

129. Defendant Jindal’s plan for a patient who had vomited five times, could not eat or drink, was not passing gas, was pale, clammy, and guarding, and had an 11-centimeter spork that had not moved in two months, consisted of a dose of milk of magnesia. She wrote: “Milk of Magnesia given to help

relieve symptoms of constipation. Consider request for EGD for removal of foreign body that is unchanged in appearance and position since x-ray in June 2025. Patient to inform HC immediately of any new or worsening symptoms."

130. Defendant Jindal did not send Vanness to the ER, did not order a CT scan, did not order blood work, and did not contact a gastroenterologist or a surgeon. She did not submit the referral for an EGD that she wrote she would "consider" until five days later.

131. Defendant Jindal knew on August 20, 2025 that an 11-centimeter plastic spork lodged in the same location in Vanness' lower abdomen for two months, in a patient who was now vomiting and guarding, exposed Vanness to a substantial risk of serious harm, including bowel obstruction, bowel perforation, and death.

132. On information and belief, Defendant Jindal did not send Vanness to the ER on August 20, 2025, and did not refer him for a CT scan or an expedited gastroenterology or surgical consultation, because of the Vitalcore custom or policy of encouraging medical providers to treat patients on-site at the prison whenever possible, and to send prisoners for offsite treatment only sparingly.

133. On Saturday, August 23, 2025, Vanness returned to the clinic. He told the nurse, “My stomach like hurts all the time now. I haven’t been able to poop in 10 days. The liquid they gave me didn’t do anything and neither did the pills.” The nurse found hypoactive bowel sounds in all four quadrants of the abdomen and tenderness in three of them. She called the on-call medical provider, who ordered two bottles of magnesium citrate — another laxative — by telephone. The nurse scheduled a provider appointment for August 25 for “[u]nchanged constipation x 10 days (Dulcolax, MOM and Mag citrate x 2 implemented) and worsening abdominal pain,” and noted that the “[l]ast MP note states consideration for surgical removal of spork.”

134. On the morning of Monday, August 25, 2025, Defendant Jindal submitted a consultation request for an EGD. The request states that the “EGD for removal of FB [was] agreed upon per Grand Rounds on 08.25.2025.” A companion note by Defendant Jindal states that the “EGD [was] agreed upon for removal of FB on 08.21.2025.”

135. On information and belief, “Grand Rounds” refers to the Vitalcore utilization-management process through which Vitalcore’s corporate physicians decide whether a Michigan prisoner will be permitted to receive the specialty or offsite care recommended by the provider who examined

him. On information and belief, Defendant Coleman, as Vitalcore's Utilization Management Director for the MDOC contract, participated in or supervised the "Grand Rounds" review of Vanness' case on or around August 21, 2025.

136. The Grand Rounds review approved an EGD for a foreign body that three x-rays on June 20, 2025, June 26, 2025, and August 20, 2025 had all placed in the lower abdomen at the level of the L4-L5 vertebrae, far beyond the reach of an endoscope. Nobody involved in the Grand Rounds review ordered a CT scan to determine where in the intestinal tract the spork actually was, and nobody ordered a surgical consultation.

137. Defendant Jindal assigned the EGD referral a priority of "Routine," with a due date of November 19, 2025. This was nearly three months away, and more than five months after Vanness swallowed the spork. On information and belief, the "Routine" priority was assigned with the knowledge and approval of Vitalcore's utilization-management personnel, including Defendant Coleman.

138. Later that same morning, a nurse canceled an August 25 provider appointment because Vanness reported that his constipation had "resolved

since drinking 2 Mag Citrates." The "worsening abdominal pain" for which the appointment had also been scheduled was not addressed.

139. Defendant Jindal saw Vanness the next day, August 26, 2025. His heart rate was 104 beats per minute, and his abdomen was diffusely tender. Defendant Jindal charted "Tachycardia" and "Diffuse Tenderness," told Vanness that he was "rescheduled for removal of FB," prescribed a bottle of magnesium citrate "every week" as needed, and "[e]ncouraged patient to increase fluid intake." In fact, no appointment had been scheduled for removal of the spork. The consultation request was not even faxed to an outside hospital until September 18, 2025, more than three weeks later.

140. Defendant Jindal saw Vanness again on August 28, 2025, for a gender-dysphoria follow-up. She again charted "Stomach Pain," "Abdominal Pain," "Constipation," and "Diffuse Tenderness" on examination, and again did nothing about the spork.

141. On August 30, 2025, Vanness submitted a healthcare request form asking for "a new script for tylanall for my stomach pain." On September 3, 2025, a nurse saw him for "sharp" and "stabbing" 6/10 pain in the left lower quadrant of his abdomen, gave him a three-day order for Tylenol, and noted, "Foreign body removal is already being requested through MP." Defendant

Jindal cosigned that note. It was the last contact that any Vitalcore medical provider had with Vanness' care.

142. In the twenty-one days between August 14 and September 3, 2025, Defendant Jindal examined Vanness four times. She documented the unpassed spork at three of those visits and abdominal pain with diffuse tenderness at all four; on August 20, she cosigned a nurse's examination which documented vomiting, guarding, and an inability to pass gas; and she documented tachycardia on August 26. Her treatment consisted of Dulcolax, milk of magnesia, magnesium citrate, water, Tylenol, and a "Routine" referral for a procedure that could not reach the object. She never ordered a CT scan, never obtained an expedited gastroenterology or surgical consultation, and never sent Vanness to a hospital.

143. On September 4, 2025, the MDOC transferred Vanness from Gus Harrison back to the Carson City Correctional Facility, where he had swallowed the spork three months earlier. The MDOC transfer summary that accompanied him listed his "Pending Consultations." The only consultation listed was an audiology appointment. The EGD referral was not listed.

144. Defendant Jillian Tackebury, R.N. performed the transfer-receiving assessment at Carson City on September 4, 2025. Vanness' heart rate was

100 beats per minute. Defendant Tackebury charted "No Significant Findings/No Apparent Distress," and "Educated inmate on the signs and symptoms to report to nursing."

145. On September 10, 2025, Defendant Allison Melinowski, R.N. saw Vanness for a follow-up on the effectiveness of Tylenol for his abdominal pain. Vanness told her, "It doesn't really help, it still comes and goes," and described intermittent 6/10 "stabbing" pain "approximately 4 inches from [the] L side of [his] umbilicus" — the same region of the lower abdomen, to the left of midline, where every x-ray since June had shown the spork. Vanness told Defendant Melinowski that he did not want to be assessed by a medical provider because, in his words, "I just want to wait for my surgery."

146. Defendant Melinowski knew that Vanness had a spork lodged in his intestine, and she knew that the risk it posed was a perforated bowel: she charted that she "[e]ducated inmate to contact HC immediately with any s/s of bowel perforation or abdominal pain." She did not check whether the "surgery" that Vanness was waiting for had actually been scheduled, did not notify a medical provider that a patient with a retained foreign body was reporting persistent stabbing pain at the location of the object, and did not refer him to a provider.

147. On September 18, 2025, twenty-four days after the referral was submitted, an authorization for the EGD was faxed to UM Health-Sparrow Carson Hospital. On September 19, 2025, Sparrow declined the referral. The authorization was then faxed to a gastroenterology practice at Sheridan Community Hospital, which scheduled the EGD for September 26, 2025. Consistent with MDOC practice, Vanness was not told the date.

148. On or about September 22, 2025, Vanness submitted a healthcare request form that reads, in its entirety: “This Spoon is cuscing me major pain. Please help me.” The nurse who processed the request on September 23 placed Vanness on the “RN unscheduled list” to be seen later that day.

149. Defendant Tackebury saw Vanness in the Carson City clinic at 8:50 p.m. on September 23, 2025. Vanness told Defendant Tackebury that his pain came and went and that he “vomit[s] occasionally.”

150. Defendant Tackebury knew that Vanness had a spork lodged in his intestine; it was his chief complaint. She knew that he was awaiting its removal. And she knew, as her colleague Defendant Melinowski had charted thirteen days earlier, that the danger posed by a retained foreign body in the intestine is bowel perforation.

151. Defendant Tackebury did not examine Vanness' abdomen. The "Exam" section of her note is blank. She did not contact the on-call medical provider. She did not send Vanness to the ER, even though he was reporting vomiting, one of the two symptoms that Defendant Stadel's June 6 plan had identified as requiring an immediate return to the hospital. Instead, she charted that Vanness "appears very stable at this time," told him to "notify healthcare immediately" if anything changed, and sent him back to his housing unit on foot.

152. At approximately 5:50 a.m. on September 24, 2025, nine hours after Defendant Tackebury sent him back to his cell, a corrections officer found Vanness unresponsive in his cell. By the time a nurse arrived at 6:00 a.m., Vanness was lying on his back in the hallway outside his cell with an AED attached and CPR in progress. The nurse found that Vanness was "apneic and pulseless," that his skin was "cool to the touch," that his arms and legs were stiff with rigor mortis, and that livor mortis had already discolored his face, his chest, and the front of his body. "[W]ithin about ten seconds of having arrived at the scene," the nurse told the officers that they could stop chest compressions "as cardinal signs of death were present." Vanness was pronounced dead at 6:01 a.m.

153. Rigor mortis and livor mortis take hours to develop. Vanness had been dead for hours before he was found. He died alone, in his cell, at some point during the night after Defendant Tackebury sent him back to his unit.

## III. The autopsy

154. A forensic pathologist performed an autopsy on September 25, 2025. She found that Vanness' ileum, which is the final section of the small intestine, was "adhered to itself," and that when the adhesion was released it revealed "two perforations, rimmed with black discoloration." The pathologist's stated cause of death is "Small bowel perforation."

155. The pathologist also found that Vanness' colon was "distended by gas" and that his stomach still contained 300 milliliters of partially digested food from his last meal, which is consistent with an intestinal tract that had stopped moving its contents forward.

156. Black discoloration at the rim of a perforation is dead tissue. A section of ileum that has adhered to itself is a section that has been inflamed for long enough for the body to wall it off. These findings are consistent with a rigid, pointed object that has pressed against the same small area of intestinal wall for weeks, cutting off its blood supply until the wall gave way.

157. The pathologist did not find the spork. Because Defendants performed no imaging after August 20, 2025, the record does not establish whether the spork passed out of Vanness' body in the thirty-five days between the last x-ray and his death or was simply not found. The pathologist noted "abundant fecal material" in the bowel, and it is unclear whether she searched through all of the fecal material throughout the length of the intestines to try to find the spork.

158. The pathologist, who based her opinion on "the history as available to [her]," wrote that "[t]he etiology of the adhesion is unknown" and classified the manner of death as "indeterminate." Vanness was 27 years old, had never had abdominal surgery, and had no history of any inflammatory or structural disease of the bowel. The only thing in his medical history capable of producing an adhesion and two perforations in his ileum was the 11-centimeter spork that Defendants left in his body for three and a half months.

## IV. Vitalcore's Customs and Policies

159. On information and belief, Vitalcore did not train its Michigan medical providers on the published clinical guidelines for the management of ingested foreign bodies, which call for prompt endoscopic removal of

objects longer than 6 centimeters and of sharp or pointed objects, and which recognize that such objects are unlikely to pass on their own. The need for such training was obvious. As Vitalcore is aware, prisoners with serious mental illness swallow foreign objects with regularity, and the consequence of mismanaging a retained sharp object can include bowel perforation and death.

160. On information and belief, in circumstances in which a Michigan prisoner is transported to a community hospital on an emergent basis, Vitalcore delegated final decisionmaking authority to Defendant Coleman to authorize, or not authorize, treatment at the community hospital or transfers to other community hospitals. Defendant Coleman's decision to order that Vanness be returned to the prison without a consultation with a gastroenterologist for an EGD procedure was the decision of Vitalcore itself.

161. Vitalcore's policy and custom of minimizing offsite and emergency care, its utilization-management practices, and its failure to train and supervise its providers were the moving force behind the decisions of Defendants Coleman, Adams, Jane Doe Medical Provider #1, Stokely-Hamdan, Sinclair, Janowiecki, and Jindal to leave the spork in Vanness' body.

## V. Damages

162. As a direct and proximate result of Defendants' acts and omissions, Vanness endured one hundred and ten days of conscious physical pain and suffering; recurrent nausea and vomiting; periods in which he could not eat; the fear, which he expressed repeatedly and in writing, that the object inside him was hurting him and that nobody would remove it; and, ultimately, death from a perforated bowel, alone in a prison cell, at the age of 27.

163. Vanness' Estate, and the persons entitled to recover under Michigan's Wrongful Death Act, MCL § 600.2922, have suffered damages including Vanness' conscious pain and suffering before his death; medical, funeral, and burial expenses; and the loss of Vanness' society and companionship.

## COUNT I

**42 U.S.C. § 1983 – Eighth Amendment**
**Deliberate Indifference to Serious Medical Needs**

**(Defendants Coleman, Adams, Jane Doe Medical Provider #1, Stokely-Hamdan, Sinclair, Janowiecki, Jindal, Williams, Melinowski, and Tackebury, all in their individual capacities, Vitalcore Physicians Group, PLLC, and Vitalcore Health Strategies LLC)**

164. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

165. At all times relevant to this Complaint, each of the Defendants named in this Count acted under color of state law. Defendants Williams, Melinowski, and Tackebury acted as employees of the Michigan Department of Corrections. Defendants Coleman, Adams, Jane Doe Medical Provider #1, Stokely-Hamdan, Sinclair, Janowiecki, and Jindal acted as employees of Vitalcore Physicians Group PLLC and/or Vitalcore Health Strategies, LLC, entities to whom the State of Michigan had delegated its constitutional obligation to provide medical care to the prisoners in its custody.

166. The Eighth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, prohibits deliberate indifference to the serious medical needs of prisoners.

167. Vanness' retained 11-centimeter spork was an objectively serious medical need. It had been diagnosed by a physician as a condition requiring serial monitoring and, upon any worsening of symptoms, surgical or endoscopic removal. The dangers of leaving an 11-cm spork in a person's intestinal tract are so obvious that even a layperson would recognize the

need for medical attention. And because it was left untreated, it caused pain, vomiting, bowel obstruction, bowel perforation, and death.

168. Each Defendant named in this Count had actual knowledge of the spork in Vanness' gastrointestinal tract, from Vanness himself, from his medical chart, and from the x-ray reports described above. Each Defendant knew that a long, rigid, pointed foreign object retained in the intestinal tract exposed Vanness to a substantial risk of serious harm, including bowel perforation and death.

169. Each Defendant named in this Count consciously disregarded that risk. Each Defendant failed to take the reasonable and readily available measures that the risk required, including returning Vanness to the emergency room as the ER physician's plan directed, obtaining a CT scan to locate the object, obtaining an expedited gastroenterology or surgical consultation, or having Vanness examined by a physician. The treatment these Defendants provided instead, consisting of laxatives, Tylenol, water, weekly x-rays that were often not obtained, and a "Routine" referral for a procedure that could not reach the object, was so cursory, and so divorced from the actual danger, as to amount to no treatment at all, and reflected a conscious choice of an easier and less efficacious course of treatment.

170. The deliberate indifference of each Defendant named in this Count was a direct and proximate cause of Vanness' conscious pain and suffering, his bowel perforation, and his death, and of the damages described above.

171. The policies, practices, and customs of Vitalcore Health Strategies, LLC and its alter-ego, Vitalcore Physicians Group, PLLC, were the moving force behind the Vitalcore employees' violations of Vanness' constitutional rights.

172. The conduct of each Defendant named in this Count was willful, wanton, and in reckless disregard of Vanness' constitutional rights, entitling Plaintiff to an award of punitive damages against each of them in their individual capacities.

173. Plaintiff is entitled to recover reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II

## 42 U.S.C. § 1983 – Eighth Amendment Deliberate Indifference to a Substantial Risk of Serious Self-Harm

**(Against Defendant Peterson)**

174. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

175. At all times relevant to this Complaint, Defendant Peterson acted under color of state law as an employee of the Michigan Department of Corrections responsible for evaluating Vanness' risk of suicide and self-harm and for determining the precautions that would be taken to protect him from that risk.

176. The Eighth Amendment requires prison officials to take reasonable measures to protect prisoners from a known, substantial risk of serious self-harm.

177. As of June 4 and June 5, 2025, Vanness faced a substantial and obvious risk of serious self-harm. Within the preceding seventy-two hours, Defendant Peterson had personally documented that Vanness was experiencing suicidal ideation with specific plans; that he was hearing voices telling him to kill himself; that he had told her he would harm himself until he was transferred out of the facility; and that he was banging his head against glass. She knew his history of suicide attempts, self-injurious behavior, and inpatient psychiatric treatment, and, on information and belief, she knew of the diagnosis of bipolar disorder with psychotic features recorded in his medical chart. On June 4, 2025, she was told by custody staff that he had not slept in twenty-four hours.

178. Defendant Peterson consciously disregarded that risk. Over a period of approximately twenty-four hours, on the basis of two cursory evaluations conducted through a cell door, she stepped Vanness down from continuous observation to a Moderate plan and then to an Intermediate plan with "No Restrictions," restoring his access to eating utensils and personal property while the condition on which he had premised his threats of self-harm remained unchanged.

179. As a direct and proximate result of Defendant Peterson's deliberate indifference, Vanness obtained a spork and swallowed it within twenty-four hours of being removed from suicide precautions. The ingestion of the spork was a direct and proximate cause of Vanness' death.

180. Defendant Peterson's conduct was willful, wanton, and in reckless disregard of Vanness' constitutional rights, entitling Plaintiff to an award of punitive damages against her in her individual capacity, and to reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT III

## <u>Medical Malpractice – Wrongful Death</u>

## (Against Defendants Stadel and Sparrow Carson Hospital)

181. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

182. On June 6, 2025, a physician-patient relationship existed between Defendant Stadel and Vanness, and Defendant Stadel owed Vanness a duty to exercise the degree of care, skill, and diligence exercised by a reasonably prudent board-certified emergency medicine physician under the same or similar circumstances, in light of the facilities available in the community and other facilities reasonably available under the circumstances.

183. Defendant Stadel breached the standard of care in one or more of the following ways: (a) failing to obtain a gastroenterology consultation for an 11-centimeter, pointed foreign body in the stomach, despite the radiologist's express recommendation that she do so; (b) failing to arrange the transfer of Vanness to a facility capable of performing an endoscopic removal of the spork while it remained in the stomach; (c) discharging Vanness to a prison with a conditional plan of care whose execution depended entirely on prison medical staff, when the standard of care required removal of the object rather than observation; (d) permitting a physician who had never examined Vanness, Defendant Coleman, to dictate Vanness' disposition.

184. Defendant Sparrow Carson Hospital is vicariously liable for the negligence of Defendant Stadel, who was at all relevant times its employee or its actual or ostensible agent, acting within the scope of her employment or agency. Vanness looked to the hospital, and not to any particular physician, for his emergency care, and the hospital held Defendant Stadel out as its agent.

185. As a direct and proximate result of the negligence of Defendants Stadel and Sparrow Carson Hospital, the spork was not removed from Vanness' stomach when it could have been, migrated into his small intestine where it lodged, and caused the obstruction, perforation, pain, suffering, and death described above.

186. Plaintiff is entitled to recover from Defendants Stadel and Sparrow Carson Hospital all damages recoverable under Michigan's Wrongful Death Act, MCL § 600.2922, including Vanness' conscious pain and suffering, medical, funeral, and burial expenses, and the loss of Vanness' society and companionship suffered by those entitled to recover under the Act.

## COUNT IV

## **Medical Malpractice – Wrongful Death**

**(Against Defendant Lampropoulos)**

187. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

188. On June 12, 2025, Defendant Lampropoulos undertook to interpret an abdominal x-ray of Vanness and owed him a duty to exercise the degree of care, skill, and diligence exercised by a reasonably prudent radiologist under the same or similar circumstances.

189. Defendant Lampropoulos breached the standard of care in the manner described above, including by failing to identify and localize the spork on the June 12, 2025 x-ray; by failing to obtain or compare the prior study of June 6, 2025; and by issuing a report containing findings from another patient's study of a different part of the body, which rendered the report unreliable and which she and her colleague failed to correct when the report was addended on June 18, 2025.

190. As a direct and proximate result of Defendant Lampropoulos' negligence, the providers responsible for Vanness' care were deprived of an accurate report of the location of the spork at a time when it was still potentially within reach of an endoscope, relied on a report stating that there was no obstruction and no evidence of the object, and delayed the diagnosis

and treatment of Vanness' condition, contributing to the obstruction, perforation, pain, suffering, and death described above.

191. Plaintiff is entitled to recover from Defendant Lampropoulos all damages recoverable under Michigan's Wrongful Death Act, MCL § 600.2922.

**COUNT V**

**Medical Malpractice – Wrongful Death**

**(Against Defendants Coleman, Adams, Jane Doe Medical Provider #1, Stokely-Hamdan, Sinclair, Janowiecki, Jindal, Vitalcore Physicians Group, PLLC, and Vitalcore Health Strategies, LLC)**

192. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

193. At all times relevant to this Complaint, a provider-patient relationship existed between Vanness and each of Defendants Coleman, Adams, Jane Doe Medical Provider #1, Stokely-Hamdan, Sinclair, Janowiecki, and Jindal, each of whom undertook to provide, supervise, or authorize Vanness' medical care. Each owed Vanness a duty to exercise the degree of care, skill, and diligence exercised by a reasonably prudent physician, physician

assistant, or nurse practitioner, as applicable, in the same or similar circumstances. MCL § 600.2912a.

194. Each of these Defendants breached the standard of care in the manner described above, including by: failing to return Vanness to the emergency room when his symptoms worsened, as the ER physician's plan of care required; failing to order a CT scan to locate a retained 11-centimeter foreign body; failing to obtain a timely gastroenterology or surgical consultation; failing to perform or obtain a physician examination of a patient with unresolved and worsening symptoms; treating a retained sharp foreign body with laxatives and Tylenol; failing to follow up on ordered imaging; dismissing an elevated white blood cell count as a laboratory error; referring Vanness for a procedure incapable of reaching the object; assigning that referral a "Routine" priority; and, in the case of Defendant Coleman, directing that Vanness be returned to the prison rather than transferred for removal of the spork, and approving or failing to expedite the referral for its removal.

195. Defendants Vitalcore Physicians Group, PLLC and Vitalcore Health Strategies, LLC are vicariously liable for the negligence of each of the individual Defendants named in this Count, who were at all relevant times

their employees or actual or ostensible agents acting within the scope of their employment or agency. The Vitalcore Defendants are also directly liable for their own negligence in the selection, training, and supervision of those providers and in the design and operation of the utilization-management process through which Vanness' care was reviewed, delayed, and restricted.

196. As a direct and proximate result of the negligence of the Defendants named in this Count, Vanness suffered the obstruction, perforation, pain, suffering, and death described above.

197. Plaintiff is entitled to recover from the Defendants named in this Count all damages recoverable under Michigan's Wrongful Death Act, MCL § 600.2922.

## COUNT VI

## <u>Medical Malpractice – Wrongful Death</u>

**(Against Defendants Peterson, Williams, Melinowski, and Tackebury)**

198. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

199. At all times relevant to this Complaint, Defendant Peterson was a licensed professional counselor, and Defendants Williams, Melinowski, and Tackebury were registered nurses, each licensed under Article 15 of the Michigan Public Health Code and each employed by the Michigan Department of Corrections to provide professional mental-health or nursing care to prisoners in MDOC custody. Each of these Defendants is a "licensed health care professional" within the meaning of MCL § 600.5838a, and the claims asserted in this Count are claims for medical malpractice.

200. A professional relationship existed between Vanness and each of these Defendants. Each Defendant undertook to evaluate, assess, treat, or care for Vanness, and each owed him a duty to exercise the degree of care, skill, and diligence that a reasonably prudent licensed professional counselor or registered nurse, as applicable, would exercise under the same or similar circumstances, in accordance with the recognized standard of acceptable professional practice in the community in which each Defendant practiced or a similar community.

201. Defendant Peterson breached the standard of care applicable to a licensed professional counselor conducting suicide-risk assessments and prescribing suicide precautions in a correctional setting in one or more of the

following ways: (a) reducing Vanness' suicide-precaution level from High to Moderate on June 4, 2025, and from Moderate to Intermediate with no restrictions on June 5, 2025, within seventy-two hours of documenting active suicidal ideation with specific plans, command auditory hallucinations, and self-injurious head-banging that she personally witnessed; (b) conducting both step-down evaluations cell-side, through a cell door and within earshot of others, rather than in a confidential, out-of-cell clinical setting; (c) relying on Vanness' denial of suicidal ideation without reconciling it with his repeated, documented statements that he would continue to harm himself until he was transferred, a condition that remained unchanged; (d) failing to account for the report from custody staff on June 4, 2025 that Vanness had not slept in twenty-four hours, and for his tearfulness, poor appetite, and anxiety about a pending misconduct charge on June 5, 2025; (e) failing to consult with the psychiatric provider or the treatment team before removing all precautions from a patient with a documented diagnosis of bipolar disorder with psychotic features; (f) failing to document and consider that diagnosis, and the grandiose and dissociative symptoms she attributed to Vanness at intake, in any of her suicide-risk assessments; (g) recording dynamic risk factors as absent and protective

factors as present in a manner contradicted by her own notes of the preceding days; and (h) removing the finger-foods-only restriction, thereby giving a patient with a documented history and stated intent of self-harm access to eating utensils.

202. Defendant Williams breached the standard of care applicable to a registered nurse in one or more of the following ways: (a) on July 27, 2025, failing to obtain or document a history of the retained foreign body in a patient presenting with abdominal pain and constipation; (b) on July 27, 2025, failing to test for occult blood, or to notify a medical provider, after finding black stool on rectal examination of a patient with a retained sharp foreign body; (c) treating the presenting complaint as simple constipation without excluding the known foreign body as its cause; (d) on August 1, 2025, failing to refer a patient who reported a retained, unpassed foreign body and ongoing abdominal pain for examination by a medical provider; (e) on August 1, 2025, failing to communicate to the provider she contacted the black stool she had documented five days earlier.

203. Defendant Melinowski breached the standard of care applicable to a registered nurse in one or more of the following ways: (a) on September 10, 2025, failing to notify a medical provider that a patient with a retained

foreign body awaiting its removal was reporting persistent, recurrent stabbing pain at the location of the object and that the prescribed analgesic was ineffective; (b) failing to verify the status of the referral for removal of the foreign body, or to bring the patient's reliance on an unscheduled "surgery" to the attention of a provider; (c) accepting Vanness' declination of a provider evaluation without communicating his condition to a provider and without documenting the refusal in a manner that would prompt provider follow-up.

204. Defendant Tackebury breached the standard of care applicable to a registered nurse in one or more of the following ways: (a) on September 4, 2025, failing to identify and communicate to a provider, upon Vanness' transfer into Carson City, that he had a retained 11-centimeter foreign body and a pending referral for its removal; (b) on September 23, 2025, failing to perform or document any abdominal assessment of a patient whose chief complaint was "major pain" from a retained foreign body; (c) on September 23, 2025, failing to notify the on-call medical provider that a patient with a retained foreign body was reporting major pain and vomiting; (d) failing to send Vanness to the emergency room, or to obtain a provider order to do so, when he reported vomiting, a symptom that the ER physician's plan of care

in his chart identified as requiring immediate return to the hospital; and (e) returning Vanness to his housing unit without provider contact, further assessment, or any plan for re-evaluation.

205. Each of the breaches described above was a proximate cause of injury to Vanness. Defendant Peterson's breaches proximately caused Vanness to obtain and swallow a spork within twenty-four hours of the removal of his suicide precautions, and thereby proximately caused the one hundred and ten days of pain and suffering and the death that followed. The breaches of Defendants Williams, Melinowski, and Tackebury proximately caused the delay in the removal of Vanness' retained foreign body, deprived his providers of information that would have prompted removal of the object before it perforated his bowel, and, in the case of Defendant Tackebury, deprived Vanness of hospital evaluation and treatment in the hours before his death, when the perforation that killed him could still have been diagnosed and surgically treated.

206. As a direct and proximate result of the negligence of the Defendants named in this Count, Vanness suffered the obstruction, perforation, conscious pain and suffering, and death described above.

207. Plaintiff is entitled to recover from the Defendants named in this Count all damages recoverable under Michigan's Wrongful Death Act, MCL § 600.2922, including Vanness' conscious pain and suffering before his death, medical, funeral, and burial expenses, and the loss of Vanness' society and companionship suffered by those entitled to recover under the Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nicholas Vanness, as Personal Representative of the Estate of Jonathan Lewis Vanness, respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, and award the following relief:

A. Compensatory damages in an amount to be determined at trial, including damages for Vanness' conscious pain and suffering, mental anguish, and fright and shock before his death; medical, funeral, and burial expenses; and the loss of society and companionship suffered by those entitled to recover under MCL § 600.2922;

B. Punitive damages against each Defendant to the extent permitted by law;

C. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

D. Taxable costs and interest as allowed by law; and

E. Such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

Dated: September 15, 2026

*/s/ Ian T. Cross*
IAN CROSS (P83367)
Attorney for Plaintiff
**CROSS LAW, PLLC**
402 W Liberty St
Ann Arbor, MI 48103
P: (734) 994-9590 /
F: (888) 320-9382
ian@lawinannarbor.com

JONATHAN R. MARKO
(P72450)
Attorney for Plaintiff
**MARKO LAW, PLLC**
220 W. Congress, Fourth Floor
Detroit, MI 48226
P: (313) 777-7529 /
F: (313) 771-5785
jon@markolaw.com